ESTATE OF ROBERT F. IVERSEN, DECEASED, PITTSBURGH NATIONAL BANK, AGENT FOR JOHN D. IVERSEN, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8082-73.    Filed November 25, 1975.

■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■

*Robert J. Dodds III,* for the petitioner.
*David W. Otto,* for the respondent.

OPINION

SCOTT, *Judge:* Respondent determined a deficiency of $225,446.01 in the Federal estate tax of the Estate of Robert F. Iversen. The issues for decision are (1) whether any consideration in money or money's worth was received by decedent for the creation of a trust to secure payments to his former wife so that the value of the trust assets includable in the gross estate should be reduced by the value of such consideration under section 2043(a), I.R.C. 1954,[1] or (2) whether the value of the obligation of the decedent's estate under a separation agreement incident to a divorce is a claim against the estate supported by consideration in money or money's worth so as to be deductible from the gross estate under section 2053(a)(3).

All facts have been stipulated and are found accordingly.

Robert F. Iversen (Robert or decedent), a resident of Florida, died testate on May 24, 1969. By his will dated December 20, 1966, he appointed his brother, John D. Iversen (John) his executor. The will was admitted to probate on June 4, 1969, and letters testamentary were issued to John by the County Judge's Court, Charlotte County, Fla. John appointed Pittsburgh National Bank (Bank) as his agent in carrying out his responsibilities as executor of Robert's estate. At the time of the filing of the petition in this case the legal residence of John was Pittsburgh, Pa. On August 11, 1970, a United States Estate Tax Return (Form 706) for decedent's estate was filed with the District Director of Internal Revenue, Jacksonville, Fla.

Robert married Mary Elizabeth McKeever (Mary) on April 2, 1938, in Massachusetts. No children were born of this marriage.

In early 1950 Robert and Mary, then residents of Pennsylvania, separated. Each retained local counsel for representation with respect to their marital difficulties. Both parties were desirous of obtaining a divorce and settling their property interests. During the separation period Mary continued

---

[1] All references are to the Internal Revenue Code of 1954.

to live in the family home and Robert paid for the upkeep and maintenance of the home as well as living expenses for Mary.

On September 8, 1950, Robert and Mary entered into an agreement (the separation agreement). This agreement which was executed in Pennsylvania provided in part as follows:

WHEREAS, they are no longer living together, and realizing that it will no longer be possible for them to live together as husband and wife, they have hereunto entered into this Agreement in order to settle their marital and property rights without resorting to legal proceedings, except as hereinafter provided; and

WHEREAS, the parties hereto have agreed upon the sums to be paid by the husband to the wife and the manner of payment in full satisfaction of any claim or demand which the wife now has or had or in the future may have against the husband for the wife's support and maintenance; and

WHEREAS, the husband and wife have agreed upon the discharge of the wife's marital rights and the sums and manner of payment, and have agreed upon the discharge of the husband's marital rights; and

WHEREAS, it is intended that the wife will proceed in a diligent manner to obtain a divorce a vinculo matrimonii promptly after the execution of this Agreement; and

WHEREAS, it is intended that this Agreement be incident to a decree in any divorce proceedings, whether instituted by the wife or by the husband;

NOW, WHEREFORE, in consideration of the premises and the covenants hereinafter contained, the parties hereunto each intending to be legally bound hereby agree as follows:

*First:* The husband shall pay to the wife immediately or as soon as practicable after the execution of this Agreement, but in all events before the entry of the decree of divorce, Fifty Thousand Dollars ($50,000.00), which sum is in partial discharge of the wife's marital rights, other than maintenance and support, arising from the marriage between the parties in the event the wife remarries after the said divorce, and is in total discharge of said marital rights in the event the wife dies after said divorce without ever remarrying.

*Second:* The husband shall pay One Thousand Dollars ($1,000.00) per month to the wife for maintenance and support as long as she remains his wife, such payments to begin on the first day of the month immediately following the execution of this Agreement. In the event a decree of divorce is obtained by either the husband or the wife, the husband shall continue to make said monthly payments to the wife in lieu of alimony and in settlement of such legal obligation imposed upon him because of the marital relationship now existing between the parties. Such payment shall be made on the first day of each month by the husband or by his estate to the wife for her life or until her remarriage.

*Third:* In the event the wife remarries, the husband or his estate shall pay to the wife Seventy-five Thousand Dollars ($75,000.00) within thirty (30) days of said marriage upon proper proof that such event has taken place. Such payment will release in full the marital rights of said wife in the event this contingency occurs.

\* \* \*

*Sixth:* To provide for the true and faithful performance of the above covenants, the husband, at or before the execution of this Agreement, has transferred to the Commonwealth Trust Company of Pittsburgh as Trustee, stocks or securities having a presently realizable market value of at least Two Hundred Twenty Thousand Dollars ($220,000.00) for the uses and purposes and upon the terms and conditions set forth in a written agreement between the husband and said Commonwealth Trust Company of Pittsburgh, the original of which is attached hereto and made part hereof. The rights of the wife to the said monthly and lump sum payments are not limited to the security provided herein.

*Seventh:* The wife, in consideration of the premises and payments, covenants and promises of the husband, agrees to and does hereby release the husband from any and all right, claim, title and interest which she now has, has had, or hereafter may have, to other and additional support and maintenance for herself other than that contained in this Agreement.

*Eighth:* The wife, having a full knowledge of her husband's estate, hereby releases the husband and his estate from any and every claim which she now has, may hereafter have, or can have at any time, of, in, to or against the same or any part thereof, whether for support and maintenance or by way of curtesy or dower or under the intestate laws of the Commonwealth of Pennsylvania or any other jurisdiction, excepting only the provisions in this Agreement contained and provided.

*Ninth:* The husband, having a full knowledge of his wife's estate, hereby releases the wife and her estate from any and every claim which he now has, may hereafter have, or can have at any time, of, in, to or against the same or any part thereof, whether by way of curtesy or dower or under the intestate laws of the Commonwealth of Pennsylvania or any other jurisdiction, excepting only the provisions in this Agreement contained and provided.

\* \* \*

*Twelfth:* This Agreement shall not be abrogated nor its terms affected, except as herein expressly provided, by any decree of divorce, a vinculo matrimonii or a mensa et thoro, which may hereafter be entered in favor of either party hereto.

This Agreement shall be binding upon the parties hereto, their respective heirs, executors, administrators and assigns.

Pursuant to the sixth paragraph of the separation agreement, Robert entered into an agreement of trust (the trust agreement) dated September 8, 1950, and created a trust (the Mary Iversen Trust or the trust) with the Commonwealth Trust Co. of Pittsburgh as trustee. The Union National Bank of Pittsburgh (Union) was the successor by consolidation to Commonwealth Trust Co. of Pittsburgh. The trust agreement provided in part as follows:

That one of the primary intentions of the parties concerned in this matter is that the fund, or securities hereinafter mentioned, shall be available in the nature of protection and security for Mary Elizabeth Iversen with reference to the monthly payments of One Thousand Dollars ($1,000.00) hereinafter

mentioned and the lump sum of $75,000.00 which she is to receive upon remarriage, all as set forth in a Separation Agreement between the Settlor and the said Mary Elizabeth Iversen (hereinafter called "the wife" or "Mrs. Iversen"), executed contemporaneously with the execution of this agreement and dated the same day and of which this agreement is made a part.

\* \* \*

To HAVE AND TO HOLD IN TRUST NEVERTHELESS for the uses and purposes and upon the terms, trusts and conditions with the powers and authority hereinafter mentioned and expressed.

1. The Trustee shall collect the income of the securities held hereunder and, after deducting therefrom any charges and expenses properly chargeable to income in the administration of the Trust, shall pay the net income therefrom as and when received to the Settlor during the term of this Trust except as hereinafter provided.

2. In the event the Settlor is in default for more than thirty days in any manner respecting the monthly payments to his present wife, Mary Elizabeth Iversen, the Trustee shall pay to the said Mrs. Iversen or her authorized representative the sum of One Thousand Dollars ($1,000.00) per month for as long as she lives or until her remarriage, or any portion thereof not paid to the said Mrs. Iversen by the Settlor. Said payment or payments shall first be made from income and then from corpus. The Trustee shall make said payment ten days after receiving written notice, verified by affidavit, of such default, signed by Mrs. Iversen or her authorized representative. Upon receipt of such notice of default the Trustee shall mail a copy thereof to Settlor and to Fidelity Trust Company, Settlor's agent, as long as said Trust Company continues to be said agent. After receipt of the first notice of default, the Settlor shall be considered to be continually in default, and the Trustee shall continue to make said payments until Mrs. Iversen has been paid in full to that date. No payments shall be made by the Trustee to the Settlor while he is in default.

\* \* \*

3. (a) This trust shall terminate upon the occurrence of either of the following events, namely (1) the death of Mrs. Iversen or (2) her remarriage.

(b) If the Settlor, within thirty days after written notice from Mrs. Iversen of her remarriage, given to the Trustee and the Settlor, has not paid Mrs. Iversen the sum of $75,000.00 as provided in the Third paragraph of the separation Agreement above mentioned, Mrs. Iversen at her option, at any time more than ten days after the expiration of said thirty-day period, may demand and receive from the Trustee said sum of $75,000.00 which the Trustee shall pay to her out of principal or accumulated income. Mrs. Iversen covenants and agrees that upon her remarriage she promptly will notify the Settlor thereof; if she fails to do so, any of the $1,000.00 payments which she may receive as owing to her for the period after her remarriage shall be credited against the said lump sum payment herein mentioned.

(c) Upon the termination of this trust and the satisfaction of all payments due to Mrs. Iversen, the remainder of the principal and any accumulated income shall forthwith be paid over by the Trustee to the Settlor or to the personal representative of the Settlor, if the Settlor is deceased, less reasonable compensation, charges and expenses of the Trustee.

* * *

5. Neither the principal nor the income of the trust estate or estates created hereunder, or any part thereof, shall or may at any time be liable or subject in any manner whatsoever to the contracts, debts, engagements, liabilities or torts now or hereafter made, contracted, incurred, or committed, by Mrs. Iversen; nor shall the principal or income of the trust estate or estates be subject to execution, attachment, sequestration, judgment, or other process; nor shall any assignment or order, either of principal or income, given by Mrs. Iversen be valid; but the principal and income payable to Mrs. Iversen shall be paid by the Trustee direct to or for the use of Mrs. Iversen, without regard to any assignment, order, attachment or claim whatever; and all of the principal and income shall remain a part of the trust estate until paid over direct to or for the use of Mrs. Iversen.

On September 14, 1950, Mary filed a complaint seeking an absolute divorce from Robert in the Court of Common Pleas of Allegheny County, Pa. Robert did not answer the complaint. After a hearing the Court of Common Pleas of Allegheny County, Pa., entered its decree on December 12, 1950, granting Mary an absolute divorce from Robert. The divorce decree made no reference to either the separation agreement or the trust agreement.

Robert remarried on January 12, 1951. Mary never remarried. During the period of their marriage both Robert and Mary were sane.

At the time the separation agreement was executed Mary had little or no separate property of her own, nor did she have an income of her own, from employment or otherwise. Robert was discharged from the United States Navy in 1945 and from that time the only income he received was from assets which he owned and from trusts of which he was a beneficiary. For 5 years prior to the date of the execution of the separation agreement Robert's annual average income after taxes was $33,000. At the time the separation agreement was executed Robert owned in his own name securities valued at approximately $514,014 and the family home valued at approximately $50,000.

On September 8, 1950, Robert was the beneficiary of a trust established by his father (the Robert Iversen Trust), the corpus of which had an approximate value of $238,597. This trust agreement generally provided that any current or accumulated income was distributable to Robert in the discretion of the trustee and any undistributed income and the principal of the trust were distributable to Robert after his father's death as

follows: One-third at age 33, one-half of the balance at age 38, and the balance at age 45. If Robert predeceased his father, Robert's estate or his legatee designated by will was to receive as of the time of his father's death the trust estate. On September 8, 1950, Robert along with his four brothers and sisters and his mother were beneficiaries of another trust established by Robert's father (the insurance trust), the total value of which was approximately $388,969. The trust agreement generally provided that after the death of Robert's father the income of the trust was to be applied as determined in the trustee's discretion to support Robert's mother for her lifetime with any excess to be divided equally or as otherwise deemed appropriate by the trustee among her five children including Robert. Upon the death of Robert's mother, the trust estate was to be divided into five shares with each child currently receiving the income attributable to his share. Upon the death of Robert's father the principal of the trust was to be distributed with the following limitations with respect to Robert: Not more than one-sixth of his undivided one-fifth interest before age 30, not more than one-third of such interest before age 35, and not more than two-thirds of his interest before age 60. If Robert predeceased his father, his share upon his father's death was to be distributed to his estate or to his legatees by will. On September 8, 1950, Robert was a beneficiary of another trust established by his two sisters (the Mayer-Dixon Trust), the trust estate having an approximate value of $978,639. Pursuant to this trust agreement the income was to be accumulated and upon the death of Robert's father the accumulated income and principal were to be distributed equally to each of the five children including Robert but with the same limitations with respect to Robert as were contained in the insurance trust. Robert was born on April 16, 1916, and was 34 years old at the time of the execution of the separation agreement. Robert's father died on April 12, 1967.

Pursuant to the first paragraph of the separation agreement Robert paid Mary $50,000. Robert filed a Federal Gift Tax Return reflecting this transfer on March 14, 1951.

Pursuant to the second paragraph of the separation agreement Robert paid Mary $1,000 per month from October 1950 until his death in May 1969. Mary was born on December 24, 1914, and was 54 years old at the time of Robert's death. Union as trustee continued the monthly payments in the amount of $1,000 to

Mary until her death on February 2, 1973. The total amount paid to Mary by Union as trustee was $46,000.

Mary never filed a formal claim against Robert's estate.

On May 15, 1970, John filed with the Court of Common Pleas of Allegheny County, Pa., Orphans' Court Division, a petition for the proration of Federal estate tax due by reason of Robert's death. The petition requested that the estate tax be prorated among five entities: Robert's probate estate, the Mary Iversen Trust, the Mayer-Dixon Trust, the insurance trust, and a revocable trust established by Robert on January 29, 1951. After a hearing on July 1, 1970, the Allegheny County Court entered its order dated July 9, 1970, prorating the Federal estate tax among the above-mentioned entities. For such order it was decreed that the Mary Iversen Trust "which is being held as security for monthly payments to Mrs. Iversen and a lump-sum payment upon remarriage, is not the sole asset of the estate securing said payments, but the payments are also liabilities of the balance of the Estate of the Decedent."

The Federal estate return filed by John reported a taxable estate of $2,158,807.07. Included in the gross estate on Schedule G of this return was the amount of $283,209.33 explained as the value of the Mary Iversen Trust estate in the amount of $447,945.89 reduced by commuted value of the $1,000 monthly sums payable to Mary as provided by the separation agreement in the amount of $164,736.56. The executor elected to have the gross estate valued as of a date subsequent to decedent's death pursuant to section 2032.

In his notice of deficiency respondent disallowed the claimed reduction in the value of the trust on the grounds that the reduction was not deductible under section 2053, thereby increasing the gross estate as reported by the amount of $164,736.56.[2]

---

[2] The parties have stipulated that "if the value of the annuity payable to Mrs. Iversen is deductible under Code § 2053 or reduces the value of the gross estate under Code § 2043, the correct value of that annuity is $159,343.33 rather than $164,736.56." As respondent points out in a footnote in his brief, even if we find that decedent received consideration for the transfer he made to the trust to secure payments to his former wife this stipulated fact and admission is an incorrect legal conclusion with respect to the valuation of the consideration he received. Under sec. 2043 the fair market value as of the date of decedent's death of the assets transferred and otherwise includable in the gross estate is reduced by the value of the consideration received as of the time of the transfer of the assets for the insufficient consideration and not the value of such consideration at the date of decedent's death. *United States v. Righter,* 400 F. 2d 344 (8th Cir. 1968); *Estate of Isabelle M. Sparling,* 60 T.C. 330, 337 (1973); *Estate of Daisy F. Christ,* 54 T.C. 493, 545

If a decedent has made an inter vivos transfer of property other than by a bona fide sale for adequate consideration under circumstances described in section 2035, 2036, 2037, or 2038, then the value of the property transferred to the extent of decedent's interest therein is includable in the decedent's gross estate. Section 2043(a) [3] generally provides that if the decedent receives less than adequate and full consideration in money or money's worth for such transfers of property, there shall be included in the gross estate only the excess of the fair market value at the time of death of the property otherwise to be included over the value of the consideration received therefor by the decedent. Section 2053 [4] generally provides a deduction from the value of

(1970), affd. 480 F. 2d 171 (9th Cir. 1973); *Estate of Lillian B. Gregory,* 39 T.C. 1012, 1021 (1963).

[3] SEC. 2043. TRANSFERS FOR INSUFFICIENT CONSIDERATION.

(a) IN GENERAL.—If any one of the transfers, trusts, interests, rights, or powers enumerated and described in sections 2035 to 2038, inclusive, and section 2041 is made, created, exercised, or relinquished for a consideration in money or money's worth, but is not a bona fide sale for an adequate and full consideration in money or money's worth, there shall be included in the gross estate only the excess of the fair market value at the time of death of the property otherwise to be included on account of such transaction, over the value of the consideration received therefor by the decedent.

(b) MARITAL RIGHTS NOT TREATED AS CONSIDERATION.—For purposes of this chapter, a relinquishment or promised relinquishment of dower or curtesy, or of a statutory estate created in lieu of dower or curtesy, or of other marital rights in the decedent's property or estate, shall not be considered to any extent a consideration "in money or money's worth."

[4] SEC. 2053. EXPENSES, INDEBTEDNESS, AND TAXES.

(a) GENERAL RULE.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts—

(1) for funeral expenses,
(2) for administration expenses,
(3) for claims against the estate, and
(4) for unpaid mortgages on, or any indebtedness in respect of, property where the value of the decedent's interest therein, undiminished by such mortgage or indebtedness, is included in the value of the gross estate,

as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered.

* * *

(c) LIMITATIONS.—

(1) LIMITATIONS APPLICABLE TO SUBSECTIONS (a) AND (b).—

(A) CONSIDERATION FOR CLAIMS.—The deduction allowed by this section in the case of claims against the estate, unpaid mortgages, or any indebtedness shall, when founded on a promise or agreement, be limited to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth; except that in any case in which any such claim is founded on a promise or agreement of the decedent to make a contribution or gift to or for the use of any donee described in section 2055 for the purposes specified therein, the deduction for such claims shall not be so limited, but shall be limited to the extent that it would be allowable as a deduction under section 2055 if such promise or agreement constituted a bequest,

* * *

the gross estate of amounts of claims against the estate which are allowable by the laws of the jurisdiction under which the estate is being administered. When a claim against the estate is founded on an agreement, the deduction allowable under section 2053 is limited to the extent that the obligation was contracted bona fide and for an adequate and full consideration in money or money's worth.

Marital rights in decedent's property or estate are not considered to be consideration in money or money's worth with respect to transfers of property otherwise includable in the gross estate under sections 2035 through 2038 or of claims against the estate founded upon an agreement. Sec. 2043(b); sec. 2053(e).

The parties agree that the value of the assets of the Mary Iversen Trust totaled $447,945.89 at the optional valuation date under section 2032 which was selected by the executor in filing the estate tax return and that such value was includable in decedent's gross estate.

Petitioner's primary position is that the amount includable in decedent's gross estate by virtue of the trust which had been established by Robert in accordance with the separation agreement should be reduced under section 2043(a) by the consideration received by Robert for the transfer in trust. Petitioner argues that Robert had a valid and legal obligation under the separation agreement to make monthly payments to his former wife, that to the extent he failed to make these payments the trust was obligated to make them, and that this obligation of the trust to make the payments was supported by consideration in money or money's worth. Petitioner argues that this consideration existed since the trust was part of the financial settlement of the rights and duties arising from the existing marital relationship of Robert and Mary when the agreement providing for the trust was entered into, including her right to support. Petitioner relies on *United States v. Davis,* 370 U.S. 65 (1962); Rev. Rul. 68-379, 1968-2 C.B. 414. Petitioner argues that monthly payments made to Robert's former wife after his death when no right to support existed under local law do not preclude Robert from having received consideration in money or

---

(e) MARITAL RIGHTS.—
  For provisions that relinquishment of marital rights shall not be deemed a consideration "in money or money's worth," see section 2043(b).

money's worth at the time of the execution of the separation agreement and the trust citing *Sherman v. United States,* 334 F. Supp. 1311 (N.D. Ga. 1971), affd. in part and revd. in part and remanded 462 F. 2d 577 (5th Cir. 1972). Petitioner's alternative position is that the obligation to pay the monthly sums to Mary under the separation agreement was a claim against the estate that was founded upon an agreement supported by consideration in money or money's worth and therefore the value of this obligation is deductible from the gross estate under section 2053(a)(3).[5]

It is respondent's position that under the facts of this case decedent's gross estate is not reduced under section 2043(a) by the monthly payments to be made to Mary as Robert did not transfer any property into the trust for Mary's release of any obligation to support that Robert had under Pennsylvania law or any obligation he had assumed under the separation agreement. Respondent argues that Mary never acquired any interest in the trust other than a contingent one, that the trust was merely to provide security for the monthly payments, and that Robert or his estate was obligated to make the monthly payments under the separation agreement. Respondent contends that the creation of the trust and the transfer of property to it were not for Mary's release of any marital claims that she had, but, that any marital claims Mary may have had were released for Robert's or his estate's obligations to make the payments required under the separation agreement. Respondent further contends that the value of the obligation of Robert or his estate to make the monthly payments under the separation agreement is not deductible from the gross estate as a claim against the estate under section 2053(a)(3). Respondent argues that the requirement of section 2053(c)(1) is not met as to this obligation since Robert received no consideration in money or money's worth with respect to the monthly payments to be made to Mary after the absolute divorce since under Pennsylvania law a husband has no obligation to support his former wife following an absolute divorce. In the event we were to consider section 2043(a) applicable to the facts of this case respondent contends that

---

[5] Petitioner does not contend that sec. 2516, I.R.C. 1954, applicable to gift tax, is applicable to the estate tax. We have heretofore avoided reaching this issue and do not consider this case to be a proper time to consider this question since petitioner does not make the argument that sec. 2516 is applicable to estate tax. See *Estate of Donald M. Nelson,* 47 T.C. 279, 287 (1966), revd. and remanded 396 F. 2d 519 (2d Cir. 1968).

Robert's transfer of property into the trust was without consideration in money or money's worth for the same reasons he argues that the obligation of the estate to make the monthly payments to Mary was not a deductible claim against the estate. Lastly respondent contends that if we should consider Mary's release of any of her marital rights under Pennsylvania law as consideration in money or money's worth for Robert's monthly payments, then the monthly payments to be made after Robert's death are not supported by consideration in money or money's worth as any such consideration that Robert received was attributable to the monthly payments to be made prior to his death since Pennsylvania law limits a husband's obligation to support his wife to one-third of his income and does not entitle her to support after the husband's death.[6]

The separation agreement provided that Robert immediately pay Mary the sum of $50,000 and pay the sum of $1,000 per month until her death or remarriage and that if Mary remarried, pay her the sum of $75,000 in discharge of her marital rights other than her right to support. The agreement further provided that "to provide for the true and faithful performance of the above covenants" Robert at the time of or prior to the execution of the separation agreement transfer stocks or security with at least a value in the amount of $220,000 to a trust to be set up pursuant to a written agreement, a copy of which was attached. The trust agreement stated that one of the primary intentions of the parties was that the trust fund was "in the nature of protection and security" for Mary with reference to the monthly payments in the amount of $1,000 and the lump sum payment in the amount of $75,000. The trustee was to currently pay the income of the trust to Robert unless Robert defaulted in making the monthly payments and notice of such default was presented by or on behalf of Mary to the trustee, in which event the trustee was to pay Mary from the trust estate such sums not paid to Mary by Robert. Further if Robert failed to pay Mary the sum of $75,000 upon notice from Mary of her remarriage, Mary at her option could receive payment of such amount from the trustee. However, the separation agreement provided that Mary's rights to the monthly and lump-sum payments were not limited "to the security provided" for in the trust.

---

[6] Respondent relies on Rev. Rul. 71-67, 1971-1 C.B. 271, which is set forth in part in n. 9 infra.

In light of these facts in this fully stipulated case, we conclude that the record fails to show that any independent consideration was exchanged for Robert's transfer of assets to the Mary Iversen trust. That trust was created as security for the payment to Mary to be made in return for the release of Mary's marital rights, including her right to support. The transfer of assets to the trust was not made in exchange for Mary's marital rights including her right to support inasmuch as these marital rights were exchanged for the payments specified in the separation agreement for which Robert or his estate was liable and remained liable with the trust estate merely a security arrangement. While we recognize that an unsecured payment may be less valuable than a secured payment and that the separation agreement and trust agreement were both part of one integrated transaction in settlement of Mary's marital rights including her right to support, there is no evidence in this record to indicate that Mary demanded any less for her marital rights by virtue of the security that was provided by the trust. Since Robert possessed at the time of the separation agreement a substantial estate, it would be unrealistic to assume, without proof, that any portion of the marital rights relinquished by Mary was attributable to Robert's transfer of assets to the trust. See *Adriance v. Higgins,* 113 F. 2d 1013, 1017 (2d Cir. 1940). Cf. *Estate of Howard Lee Davis,* 51 T.C. 269, 276 (1968), revd. and remanded on another ground *In Re Estate of Davis,* 440 F. 2d 896 (3d Cir. 1971). In conclusion we find that Robert received no consideration for the transfer of assets to the Mary Iversen Trust and hold that the value of the trust estate at decedent's death which was includable in decedent's gross estate is not reduced to any extent under section 2043(a).

Our determination that under the facts of this case decedent's gross estate is not reduced pursuant to section 2043(a) is not dispositive of this case.

The more difficult question is whether the value of Mary's claim under the separation agreement against decedent's estate to the monthly sums for her lifetime or until her earlier remarriage is deductible as a claim against the estate under section 2053(a)(3).[7] The parties agree that the courts of the State of

---

[7] Petitioner does not contend that the amount of $75,000 payable under the separation agreement to Mary upon her remarriage is deductible as a claim against the estate under sec. 2053. In any event in our view the commuted value at decedent's death of Mary's rights under the separation agreement to receive such amount is not deductible under sec. 2053 as the claim was not supported by a transfer for "a consideration in money or money's

Florida, the jurisdiction under which the estate is being administered, would apply Pennsylvania law in determining the validity of the separation agreement. Neither party disputes the validity of that agreement under Pennsylvania law. Since the separation agreement is valid, it is enforceable and the payments required by the agreement are collectible under the law of the State of Florida. However, a deduction for a claim against the estate, when founded on a promise or agreement, is limited pursuant to section 2053(c)(1)(A) to the extent that the claim was "contracted bona fide and for an adequate and full consideration in money or money's worth." The relinquishment of dower, or a statutory estate created in lieu of dower or of other marital rights in decedent's property or estate, is not considered a "consideration in money or money's worth" under section 2043(b) pursuant to section 2053(e).

Transfers of property made pursuant to a decree of the divorce court and not pursuant to an agreement negotiated between the parties prior to divorce have been held not to be founded upon a "promise or agreement" but upon the divorce decree which is deemed to provide a consideration in money or money's worth for the transfers of property to the wife, and consequently, the claim is deductible from the gross estate under section 2053. *Harris v. Commissioner,* 340 U.S. 106 (1950); *Estate of Myles C. Watson,* 20 T.C. 386 (1953), affd. 216 F. 2d 941 (2d Cir. 1954). Under the facts here the divorce decree did not make reference to the separation agreement or the agreement of trust. It merely granted the parties an absolute divorce. Clearly the divorce decree did not operate to transfer any property to Mary and the transfer of property was effectuated by the separation agreement. Consequently, the claim against the estate being founded upon the separation agreement is deductible under section 2053(a) only to the extent it is supported by a "consideration in money or

worth." The agreement specifically provided that in the event she remarried the initial $50,000 lump-sum payment was only in partial discharge of Mary's marital rights, other than support, and the additional lump-sum payment of $75,000 was in exchange for the release in full of her marital rights. Sec. 2043(b) specifically applies to the transfer of property in exchange for the relinquishment of dower or other marital rights and consequently pursuant to such section and sec. 2053(e) such release cannot be considered a consideration in money or money's worth under sec. 2053. Moreover, it was uncertain at Robert's death that Mary would ever remarry and that the estate would have to make the $75,000 payment to her. In fact Mary had not remarried at the time of her death and Robert's estate will never have to make the payment of $75,000. See *Estate of Inez G. Coleman,* 52 T.C. 921, 925 (1969).

money's worth" (sec. 2053(c)), thus requiring a determination of whether the interest relinquished by Mary constitutes "consideration in money or money's worth" under section 2053 and if so the amount of "consideration" equivalent to money value provided Robert, the transferor.

The type of consideration flowing to the transferor of property that is considered a consideration in money or money's worth and not proscribed by section 2043(b) is that (1) made pursuant to an immediately binding settlement agreement prior to a divorce in which the wife relinquished a presently enforceable claim under local law to an outright portion of a husband's property to become effective upon their subsequent divorce, *Estate of Robert Rodger Glen,* 45 T.C. 323 (1966), and (2) made pursuant to an immediately binding settlement agreement in which the wife released her then-existing right to support under local law. *Estate of H. B. Hundley,* 52 T.C. 495, 508 (1969), affd. per curiam 435 F. 2d 1311 (4th Cir. 1971); Rev. Rul. 68-379, 1968-2 C.B. 414; Rev. Rul. 71-67, 1971-1 C.B. 271. See E. T. 19, 1946-2 C.B. 166; *Estate of Robert Rodger Glen, supra* at 335.

While Mary at the time of the execution of the separation agreement had no presently enforceable claim under Pennsylvania law to an outright portion of Robert's estate upon divorce,[8] she did have the right to support and maintenance under Pennsylvania law while she was Robert's wife. *Henry Oliver Rea,* 35 B.T.A. 1132, 1136 (1937); *Dixon v. Commissioner,* 109 F. 2d 984, 986 (3d Cir. 1940); *McFarland v. McFarland,* 176 Pa. Super. 342, 107 A. 2d 615, 617 (1954). Pa. Stat. Ann. tit. 48, secs. 131, 132 (1965), and tit. 23, secs. 46, 47 (1955); Pa. Stat. tit. 18, sec. 4733 (1936). Respondent recognizes that Mary had a right to support by Robert as his wife at the time the separation agreement was entered into but argues that under the facts of this case, as shown in the provisions of the

---

[8] Petitioner's reliance on *Edward B. McLean,* 11 T.C. 543 (1948), is misplaced. The facts of that case are distinguishable since in that case the divorce decree incorporated the separation agreement and consequently, we followed the rationale of *Commissioner v. Converse,* 163 F. 2d 131 (2d Cir. 1947), where the divorce decree created the rights of the parties and not the agreement so that payments pursuant to the decree were considered to be supported by full consideration. *Harris v. Commissioner,* 340 U.S. 106 (1950), adopted and extended the rationale of *Converse.* Moreover, we have construed our holding in the *McLean* case that transfers made to settle marital rights which were converted into immediately enforceable claims upon divorce were supported by full consideration to be limited to presently enforceable claims to an outright portion of a spouse's property upon divorce. *Estate of H. B. Hundley, supra* at 513.

separation agreement, Robert's promise to pay the stated monthly sums was founded upon Mary's release of her right to support following an absolute divorce. Respondent contends that since under Pennsylvania law there is no right of a wife to support following an absolute divorce, Mary did not relinquish a "consideration in money or money's worth."

Respondent argues that the second paragraph of the separation agreement provided that Robert pay Mary monthly the amount of $1,000 as long as she remained his wife and that, should she no longer remain his wife but obtain a divorce a vinculo matrimonii, he pay her the same amount each month in effect for his right to remarry. Respondent asserts that his interpretation of the separation agreement is buttressed by the conduct of the parties to the agreement insomuch as Mary filed for a divorce from the bonds of matrimony on September 14, 1950, a decree of absolute divorce was granted on December 12, 1950, and Robert remarried on January 12, 1951.

Robert and Mary entered into the separation agreement on September 8, 1950. Robert and Mary agreed that he pay her monthly the amount of $1,000 for maintenance and support as long as she remained his wife and "in the event a decree of divorce is obtained" by either Robert or Mary, Robert pay Mary such monthly amount "in lieu of alimony and in settlement of such legal obligation imposed upon him because of the marital relationship now existing between the parties." Further Mary agreed to release Robert from any right to additional support "she now has, has had, or hereinafter may have." Lastly Robert and Mary agreed that the separation agreement was not to be abrogated nor its terms affected, except as expressly provided, by "any decree of divorce, a vinculo matrimonii or a mensa et thoro, which may hereafter be entered" and that the agreement was binding upon the parties, their respective heirs, executors, administrators, and assignees.

In our view the facts do not support respondent's premise that for her claim against the estate Mary relinquished only her right to support after an absolute divorce. While the separation agreement is not unambiguous, in our view the intent of the parties as expressed therein was that Mary would promptly proceed "to obtain an absolute divorce," but the agreement was to be binding upon them whether in fact she obtained such a divorce or obtained a decree of divorce from bed and board. The

agreed-upon monthly payments were in satisfaction of Mary's right to support and maintenance that existed under Pennsylvania law at the time the separation agreement was executed or which would accrue to her under Pennsylvania law should a decree of divorce from bed and board be granted. See *Henry Oliver Rea,* 35 B.T.A. 1132 (1937).

The preamble to the separation agreement provided that the parties had agreed to the amount and manner of Robert's payments in full satisfaction of any claim which Mary then had or had had or in the future may have against Robert for her support. The second paragraph of the separation agreement dealt principally with the amount and timing of Robert's payments to Mary. The seventh and eighth paragraphs of the separation agreement dealt more directly with Mary's release of her right to support. Pursuant to the second paragraph of the separation agreement, Robert was to pay the monthly amounts while Mary remained his wife and in the event a divorce decree was obtained by either of them Robert would continue to make the payments. While an absolute divorce is the only divorce which severs the bonds of matrimony, we do not construe the words "a decree of divorce" as used in the second paragraph of the separation agreement to refer only to a decree of absolute divorce. It is more reasonable that "a decree of divorce" referred to either a decree of an absolute divorce or of a divorce from bed and board. As stated in the preamble to the agreement, Robert and Mary intended that Mary obtain an absolute divorce and if they had meant "a decree of divorce" as used in the second paragraph to mean only an absolute divorce decree they would have stated "the decree of divorce" as the parties did with reference to their anticipated absolute divorce in the first paragraph of the separation agreement which provided that Robert pay Mary the amount of $50,000 before the entry of "the decree of divorce." Further, the separation agreement in the 12th paragraph made reference to "any decree of divorce, a vinculo matrimonii or a mensa et thoro" which infers that "a decree of divorce" in the 2d paragraph intended either such decree. If the parties had intended "a decree of divorce" to mean only absolute divorce, in our view they would not have provided for either of them obtaining a divorce decree as they did in the 2d paragraph and the 12th paragraph, insomuch as they intended that Mary promptly proceed in a diligent manner to obtain an absolute

divorce. Further, the interpretation of "a decree of divorce" to encompass only an absolute divorce would render meaningless the provision that the monthly payments after a divorce decree were "in lieu of alimony and in settlement of such legal obligation imposed upon him because of the marital relationship now existing between the parties" as under Pennsylvania law, the State in which both parties resided at the time of the execution of the separation agreement and in which that agreement was executed, Robert had no legal obligation to pay alimony after a decree of absolute divorce. *In Re Estate of Erwin,* 430 Pa. 431, 243 A. 2d 420 (1968); *Commissioner v. Rankin,* 270 F. 2d 160, 164 (3d Cir. 1959), affg. a Memorandum Opinion of this Court; *Dixon v. Commissioner, supra.*

In our view the characterizing of Robert's payments as "in lieu of alimony" and the reference to "in settlement of such legal obligation" were viewed by the parties as necessary to protect Robert from having to make additional alimony payments to Mary in the event that she later sought and obtained a divorce from bed and board with an award of alimony.

To accept respondent's construction of the separation agreement requires the conclusion that Mary exacted a considerable sum from Robert for her release of a right to support that did not exist under Pennsylvania law. It is more reasonable to conclude that under the separation agreement Mary received the substantial monthly payments in exchange for her release of existing rights to support that had substantial value. The absolute divorce of Robert and Mary after the time of the execution of the separation agreement, is not determinative or helpful in construing the terms of the separation agreement. The agreement was effective upon its execution irrespective of whether any decree of divorce was obtained. In fact Mary's filing of her complaint seeking an absolute divorce upon the execution of the separation agreement suggests that the payments under it were for her existing support rights under Pennsylvania law. We conclude that under the separation agreement Robert made the payments to Mary in return for the discharge of her claim against him to support that existed at the time of the separation agreement under Pennsylvania law by reason of her being at that time his wife. We have held a release by a wife of her existing right to support is "consideration in money or money's worth"

under section 2053(c)(1)(A). *Estate of H. B. Hundley,* 52 T.C. at 511.

Having concluded that there was consideration for Robert's agreement to pay Mary $1,000 each month for her lifetime or until her earlier remarriage, it becomes necessary to determine whether the claim against Robert's estate based on this agreement which at the time of Robert's death had a commuted value of $159,343.33 was "contracted bona fide and for an adequate and full consideration in money or money's worth." The fact that there was consideration for the agreement of Robert to pay to Mary $1,000 for her life or until her remarriage which bound his estate to pay the amount if he predeceased Mary, does not answer the question of the amount if any of consideration in money or money's worth received by Robert for binding his estate to make the payments. It is the value of this part of the agreement that constitutes the claim against Robert's estate and that claim is deductible by the estate only to the extent that the part of the agreement creating the claim was contracted for a consideration of monetary value. Sec. 2053(c)(1)(A). See *Latty v. Commissioner,* 62 F. 2d 952, 954 (6th Cir. 1933). Petitioner argues that the "consideration," Mary's relinquishment of her support rights, was "adequate and full" and that the commuted value of her claim is deductible from decedent's gross estate, relying on *United States v. Davis,* 370 U.S. 65 (1962). Respondent argues that in the event we hold that there was consideration for the separation agreement, no part of that consideration in "money's worth" is for Mary's claim to the monthly payments under the separation agreement after Robert's death since Mary was not entitled to more under Pennsylvania law than the amount of $1,000 per month during Robert's lifetime.[9]

---

[9] Respondent relies on his Rev. Rul. 71-67, 1971-1 C.B. 272, which involved a support agreement similar to the one involved in this case and provides as to the computation of the values of the wife's support rights after death of the husband as follows:

It is to be noted that a wife's support rights are generally limited to the period of the joint lives of herself and her husband or until her earlier remarriage. Thus, where, as here, the support payments are to continue beyond the period of their joint lives, a determination must be made whether the lifetime payments were less than that to which she would have been entitled to receive as support under state law. It is the value of the postponed support rights to which the deduction allowable under section 2053(a)(3) of the Code is limited (unless the value of the widow's claim is less than the value of the postponed support rights). For Federal estate tax purposes, the value of the portion of the wife's support rights which she agreed to have postponed is ascertained as of the date of the separation agreement. See *United States v. Richard S. Righter,* 400 F. 2d 344 (1968).

To determine whether at the time the separation agreement was executed Robert received equivalent money value for the monthly payments, to be paid by his estate for Mary's lifetime, or until her remarriage, it is necessary to find the monetary consideration of the support rights that existed in 1950 under Pennsylvania law that Mary released in exchange for the monetary consideration of the periodic payments that Robert agreed to pay Mary. Cf. *In Re Estate of Davis,* 440 F. 2d at 898; *Commissioner v. Estate of Nelson,* 396 F. 2d 519 (2d Cir. 1968). In *Estate of Howard Lee Davis,* 51 T.C. at 279, revd. on other grounds, we computed the value of payments to be made to a former wife after her husband's death by considering the excess of the amounts of the monthly payments to which the wife would be entitled as alimony over the amount of the alimony payments provided to indicate the value of the payments after the husband's death in a manner comparable to that used in Rev. Rul. 71-67, 1971-1 C.B. 271.

In the instant case even though Pennsylvania law does not provide for alimony after an absolute divorce there are

---

The example below illustrates the computation of the values of the wife's postponed support rights and her claim against the estate. For this purpose, it is assumed that under local law the wife would have been entitled to receive $10,000 per year as support until her husband's death. The present worth of the right to receive an annuity of $1.00 per year during the joint lives of two persons aged 45 and 57 is $11.1080. The present worth of the right of a woman aged 61, just widowed, to receive an annuity of $1.00 per year until her death or remarriage is $10.6351. These factors are based on U.S. Life Table 38, with interest at 3½ percent and the American Remarriage Table.

| | |
|---|---:|
| (1) Annual support rights | $10,000.00 |
| (2) Less: Contract payment | 7,500.00 |
| (3) Excess | 2,500.00 |
| (4) Multiply: Annuity factors for joint lives | 11.1080 |
| (5) Value of postponed support rights | 27,770.00 |
| (6) Contract payment | 7,500.00 |
| (7) Multiply: Age 61 marriage annuity factor | 10.6351 |
| (8) Value of widow's claim | 79,763.25 |
| (9) Allowable deduction (lesser of 5 or 8) | 27,770.00 |

Any factors to be computed as of a date after December 31, 1970, are to be computed on the basis of interest at the rate of six percent a year, compounded annually, life contingencies determined as to each male and female life involved, from the values of 1x that are set forth in columns 2 and 3, respectively, of Table LN of paragraph (f), section 20.2031-10 of the Estate Tax Regulations, and the American Remarriage Table, if applicable.

circumstances under which a wife may obtain support that we may consider in ascertaining the amount to which Mary might have been entitled under Pennsylvania law. If Robert, being of sufficient ability to support Mary, had deserted her without reasonable cause and had refused to provide suitable maintenance for her, she would have been entitled to obtain court-ordered support. Pa. Stat. Ann. tit. 48, secs. 131, 132 (1965); Pa. Stat. tit. 18, sec. 4733 (1936). She also could have brought an action for a divorce from bed and board and had a right to reasonable alimony pendente lite and permanent alimony as Robert's circumstances would be capable "but the same shall not exceed the third part of the annual profit or income of his estate, or of his occupation and labor." Pa. Stat. Ann. tit. 23, secs. 46, 47 (1955). This one-third limitation with respect of the amount that may be awarded a wife after a decree of divorce from bed and board has been applied by the Pennsylvania courts not only to orders for alimony pendente lite and permanent alimony, but also to orders for support. The general rule under Pennsylvania law is that the amount awarded for the support of a wife where the support of a child or children is not involved should not exceed one-third of the income from the property and labor of her husband which is defined as the equivalent of the husband's bona fide earning power at the time considering the attendant circumstances whether or not he chooses to exercise his economic capacity. See *Commonwealth Ex Rel. Fishman v. Fishman,* 213 Pa. Super. 342, 247 A. 2d 810 (1968); *Marra v. Marra,* 189 Pa. Super. 180, 149 A. 2d 175 (1959); *Commonwealth v. Rankin,* 170 Pa. Super. 570, 87 A. 2d 799 (1952); *Drummond v. Drummond,* 414 Pa. 548, 200 A. 2d 887 (1964).

Robert had received an average income of $33,000 after taxes for each of the 5 years preceding the date of the execution of the separation agreement. There is no indication in the record whether Robert deducted any amounts to compute his net taxable income that did not represent actual expenses. There is no evidence as to whether Robert had the ability to earn a salary as of 1950 and, if so, in what amount. The record does not reveal any information as to the nature of Robert's taxable income, such as whether any part thereof was capital gains. There is no adequate basis in this record to support a determination that Robert's after-tax annual income of $33,000 was not an accurate reflection of his earning capacity in 1950 to which Mary could

look for support under Pennsylvania law.[10] Therefore, because of failure of petitioner to show otherwise, we conclude that Mary was entitled under Pennsylvania law to no more than one-third of Robert's $33,000 5-year average income for her support or the amount of $11,000 per year while both were living. See *Dixon v. Commissioner, supra; Marra v. Marra,* 170 Pa. Super. 588, 88 A. 2d 112, 114 (1952). Consequently, we find that Mary's support rights under Pennsylvania law were discharged entirely by Robert's monthly payments of $1,000 during his lifetime. If we interpreted our holding in the *Estate of Howard Lee Davis* case to in effect apply the formula of Rev. Rul. 71-67, *supra,* where the support rights were less than the alimony payments, we would conclude that here Robert received no consideration in money or money's worth for his promise to pay Mary the amount of $1,000 per month after his death for her lifetime or until her earlier remarriage.[11]

Since evidence as to the reason for Robert's agreeing to pay more than the amount we compute would be due under Pennsylvania law to Mary as alimony only while both were living, or until Mary's earlier remarriage, and evidence as to whether in fact the stipulated average 5-year income of Robert of $33,000, after taxes, was an adequate reflection of his current income when the agreement was entered into is lacking in this record, we have sought other methods of determining whether Robert received any consideration for agreeing to have payments made

[10] Although under Pennsylvania law permanent alimony may be subsequently increased or decreased by the divorce court to reflect the equitable rights of the parties, *McMahon v. McMahon,* 167 Pa. Super. 51, 74 A. 2d 718 (1950), we have only considered the value of Mary's support rights as of the time of the execution of the separation agreement. Petitioner argues that the payments following Robert's death are incidental to those prior to his death. While the parties may not have used slide rules in determining the amount Robert was obligated to pay for Mary's support rights, there is nothing in the record to indicate that Robert and his attorney did not realize the significant financial impact of extending the payments beyond the joint lifetimes of Robert and Mary.

Petitioner's reliance on *Sherman v. United States,* 334 F. Supp. 1311 (N.D. Ga. 1971), affd. in part and revd. in part 462 F. 2d 577 (5th Cir. 1972), is misplaced. That case is distinguishable on its facts. In *Sherman* the District Court found that although the obligation of the husband under the agreement extended beyond the husband's lifetime, the agreement to make the after-death payments was for full consideration in money or money's worth because of being supported by the wife's relinquishment of her support rights under Georgia law.

[11] The circuit court's reversal of our decision in the *Howard Lee Davis* case, *In Re Estate of Davis,* 440 F. 2d 896 (3d Cir. 1971), did not change the method of determining the value of payments to be made after the husband's death but merely changed the amount we found allowable under State law as alimony. While no exact date of issuance of Rev. Rul. 71-67 is given, it is obviously after our 1968 opinion in the *Howard Lee Davis* case and probably after the Mar. 23, 1971, opinion date of the circuit court case.

to Mary after his death. We looked at the tables in respondent's Estate Tax Regulations (secs. 20.2031-7(f) and 20.2031-10(f)) to determine whether a $1,000-a-month payment to a woman aged 36 for her life would be less than a $1,000 a month payment for the life of a male aged 34 and found that the former was more, not less. See *Estate of Pompeo M. Maresi,* 6 T.C. 582 (1946), affd. 156 F. 2d 929 (2d Cir. 1946), where we used actuarial tables reduced by the table for a probability of remarriage in deciding a case somewhat similar to the instant case. It is obvious, of course, that an annuity for Mary's life would exceed an annuity that ended with the death of either Mary or Robert. (See sec. 20.2031-10(f), Estate Tax Regs.)

Petitioner apparently recognizes that no evidence was presented to show any specific value to the payments which were to extend after Mary's life apart from the value which Robert received for Mary's relinquishment of her support rights for her lifetime or until her remarriage. On brief, petitioner states with respect to Rev. Rul. 71-67, *supra,* that: "As a valuation ruling, it has no application to the Iversen payments because there is no evidence that the Iversens considered 'postponement' of any rights, obligations or payments in respect of them at the time of the agreement." It is precisely this lack of evidence that Robert received any "money's worth" value for the continuance of payments to Mary after his death coupled with the lack of any statistical type evidence to indicate any "money's worth" value to the continuance of the payments after Robert's death that persuades us to conclude that the claim of Mary against Robert's estate was not pursuant to an agreement supported by consideration in "money's worth."

We have, of course, considered the fact that Mary might have felt more comfortable to know that if she did not remarry she would receive the $1,000 monthly payment for life, but this is not consideration to Robert, the decedent-transferor, which is required, see *United States v. Righter,* 400 F. 2d 344, 347 (8th Cir. 1968), and even if it were it would not be consideration in "money's worth" as the statute requires.

Petitioner's reliance on *United States v. Davis, supra,* is misplaced. There the Supreme Court held that for income tax purposes a taxable event occurred upon the husband's transfer of appreciated property for his wife's marital rights and that, in determining the amount realized by him, there necessarily had to

be a rough approximation of the wife's marital rights, absent an otherwise ascertainable value. Consequently the Supreme Court accepted the value of the property exchanged for the value of the marital rights received for determining the amount realized by the husband under the income tax provisions. However, "consideration in money or money's worth" under the estate tax statutes is an objective standard which must be applied to the objective facts. See *Commissioner v. Wemyss*, 324 U.S. 303 (1945). In *Estate of H. B. Hundley*, 52 T.C. at 513, this Court stated as follows:

The absence of donative intent is immaterial * * * and * * * it is not necessary for us to decide in a case such as this "whether the relationship between husband and wife reflects the romantic waltz or the violent apache dance" since "The gift and estate tax provisions of the Internal Revenue Code set forth an objective standard by which consideration is to be measured." The fact that our findings reflect the cacophony and erratic tempo adapted to an apache dance cannot preclude the application of sections 2043(b) * * * if the objective facts of record fall within their ambit as marked out by the courts.

Applying the external test of measuring the equivalent monetary value of what the transferor at the time received for what he exchanged to the facts of this case, we find that decedent received no money value for Mary's right to the monthly payments to be made after his death and that the estate is not entitled to a deduction under section 2053 for Mary's claim against the estate. There is no indication in this record whether Mary was the natural object of Robert's bounty. However, if we assume she was not, to permit a deduction to Robert's estate for payments to be made to Mary after his death would permit a reduction in the amount of property that would be included in Robert's gross estate without a tax on the transfer of property since Robert did not receive other property of equal monetary value for the property transferred. Robert in effect exchanged the monthly payments following his death for his right to remarry and any marital rights of Mary in his property not otherwise compensated for under the separation agreement.[12] While section 2043(b) was not enacted with a view toward circumstances involving transfers of property for the release of marital rights

---

[12] Under Pennsylvania law in 1950, no issue having survived Robert, Mary, as Robert's surviving spouse, was entitled to the amount of $10,000 and one-half of the balance of Robert's estate if he died intestate and to one-half of his real and personal estate if he died testate and she elected against his will. (Pa. Stat. Ann. tit. 20, sec. 1.2 (1950), repealed effective July 1, 1972; tit. 20, sec. 180.8 (1950), repealed effective July 1, 1972.)

pursuant to a divorce, it specifically excludes the release of marital rights from being considered a consideration in money or money's worth. We have not found nor has petitioner cited any case where a court has permitted a deduction for a claim against the estate under circumstances comparable to those of the instant case. To do so would render the restrictive phrase of section 2043(b) a nullity under the facts of this case. See *Commissioner v. Bristol,* 121 F. 2d 129 (1st Cir. 1941).

In conclusion we hold that decedent's gross estate is not reduced under section 2043(a) as decedent received no consideration for the transfer of assets to the Mary Iversen Trust and that there is no deduction for a claim against decedent's gross estate under section 2053(a)(3) as decedent received no consideration in money or money's worth at the time of the separation agreement for his promise that Mary be paid the amount of $1,000 each month following his death.

Because of uncontested adjustments,

*Decision will be entered under Rule 155.*